# AFFIDAVIT

I, John Sharp, being first duly sworn, hereby depose and state as follows:

1. This Application and Affiadvit sets forth facts and evidence demonstrating that there is probable cause to believe that evidence, fruits and instrumentalities of the commission of crimes, specifically violations of federal controlled substance laws including but not limited to Title 21, United States Code, Sections 841 and 846, Conspiracy to Distribute Controlled Substances, will be found at the targeted location listed below.

2. I am submitting this affidavit in support of a search warrant authorizing a search the residence of Serguin Castro-Carias, also known as "Mateo" ("MATEO"), located at 1039 Country Colonial Street, Lot 50, Sevierville, TN, hereinafter the "TARGET RESIDENCE," which is more particularly described in Attachment A, for the items specified in Attachment B.

## Training and Experience

3. I am a Task Force Office ("TFO") with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately six months. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1). I am also currently employed by the Knox County Sheriff's Office as a detective. I have been so employed since approximately January 2007. As such I have extensive law enforcement experience including experience with drug possession, drug trafficking, and the sale of drugs in the Eastern District of Tennessee and elsewhere. I have participated in numerous search warrant executions, I have spoken with numerous confidential sources and sources of information about drug trafficking, I have worked on wiretaps on drug trafficking cases, and I have training in drug

1

trafficking offenses. I have also spoken with other law enforcement officers about drug trafficking cases and this case in particular.

4. As a result, I am familiar with matters including the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers. In addition, I am also aware that it is common for members of DTOs to possess firearms in furtherance of their drug trafficking activities. In addition, it is also common to use electronic devices such as computers, cellular telephones, and other electronic means to communicate and store information relating to the DTO and the trafficking of drugs. I am familiar with the operations of illegal drug trafficking organizations in various parts of the world, including the Eastern District of Tennessee, and the Southeastern United States. This warrant contains information sufficient to establish probable cause but does not constitute every fact known to law enforcement about this case.

5. Based upon my training and experience with narcotics trafficking, money laundering, and criminal investigations, combined with the knowledge and information provided by other law enforcement officers, I know that:

    a. Drug dealers usually keep controlled substances and paraphernalia for packaging, cutting, weighing, transporting, and distributing controlled substances at places under their control, such as their residences, or in the control of their trusted associates. Drug paraphernalia is typically in close proximity to the locations of the controlled substances themselves.

    b. Persons involved in drug distribution and its related money laundering activities acquire and maintain records related to drug distribution and records relating to the acquisition and disposition of drug proceeds. Drug traffickers

2

commonly create and maintain books, records, receipts, notes, ledgers, and documents reflecting the names, nicknames, addresses, telephone and pager and other contact numbers of their drug trafficking conspirators, including their sources of supply and their customers. These records typically document the following:

    i. amounts of money owed and amounts of drugs purchased by customers, as well as amounts of money owed to and amounts of drugs purchased from sources of supply;

    ii. transportation to acquire and to sell drugs;

    iii. the purchase of drugs, drug packaging supplies, drug paraphernalia, and other assets used to facilitate the acquisition and sale of drugs; and

    iv. the location of storage facilities and other stash locations to store drugs.

c.     Drug traffickers commonly profit and amass proceeds from their illicit activity. In order to protect their illegal activity and be able to utilize the profits, they attempt to disguise and legitimize these profits through money laundering activities.

d.     Drug traffickers often purchase and/or title assets bought with illegal proceeds in fictitious names, aliases, names of relatives, associates, or business entities, who serve as "nominee" title holders while the criminals actually own and continue to use the assets and exercise dominion and control over the assets.

e.     Drug traffickers often engage in legitimate businesses as a "front" to launder drug proceeds. The business front provides a means for the criminal to show that he/she has legitimate income, when, in fact, the income is solely from the criminal activity. Records of such legitimate businesses funded by the

3

proceeds of illegal activity constitute relevant evidence of money laundering offenses.

f. Drug traffickers maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers.

g. Drug traffickers and their associates are known to use aliases, fictitious and multiple addresses, and multiple drivers' licenses, as well as maintain records of the same, in order to conceal their true identity and hinder law enforcement investigation of their illegal activity.

h. Drug traffickers often obtain lines of credit, loans, or mortgages to purchase assets in which they have low equity interest to avoid seizure and forfeiture attempts by law enforcement authorities.

i. Drug traffickers primarily utilize U.S. currency as the method of conducting their illegal activity. Therefore, drug traffickers often maintain on hand and have quick access to large amounts of U.S. currency or other liquid assets in order to maintain and finance their ongoing criminal business.

j. Drug traffickers often utilize electronic equipment such as computers, smartphones, tablet computers, currency counting machines, and telephone

4

answering machines to generate, transfer, count, record, and/or store the information described in the preceding paragraphs.

k. Drug traffickers often use telephones to facilitate their drug activities. Records of such telephone calls, including telephone bills, are commonly kept and maintained by the drug traffickers.

l. Drug traffickers often take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product.

m. Drug traffickers commonly maintain firearms, such as handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. These weapons are used to protect and secure their property, drugs, and cash stores from thieves, as drug traffickers are often the victims of robberies and "rip-offs" during a drug or other illegal transaction. Because firearms are in demand by drug dealers, such items are often bartered for drugs or other contraband. Indeed, the law has long recognized that the presence of firearms is relevant and probative of drug crimes, as such are tools of the trade of drug traffickers.

n. Drug traffickers are not unlike other individuals in that they maintain historical documents and records such as those documents, records, and other items described above. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. These documents, records, and other items described above are often maintained in the places within the criminals' dominion and control, such as their residences, garages, other outbuildings and appurtenances associated with such

5

residences, and curtilage associated with such residences; automobiles, boats, trailers and other vehicles.

### Probable Cause

*Case Background*

6. In the spring of 2020, law enforcement in the Eastern District of Tennessee began to investigate a drug trafficking organization ("DTO"), that was distributing cocaine in Sevier County, Tennessee and elsewhere. Using confidential sources, law enforcement was able to make controlled buys from members of the DTO. As referenced below, each controlled buy was video and/or audio recorded. The transactions were also surveilled by law enforcement. Based on law enforcement's training and experience, the price paid, and the context within the investigation, law enforcement believes that the white powdery substance purchased in each instance was cocaine.

7. On or about April 30, 2020, law enforcement conducted a controlled purchase of approximately 2 grams of cocaine from Alex MARTINEZ ("MARTINEZ") in the Eastern District of Tennessee.

8. On or about May 12, 2020, law enforcement conducted a controlled purchase of approximately 2 grams of cocaine from MARTINEZ in the Eastern District of Tennessee.

9. On or about June 8, 2020, law enforcement conducted a controlled purchase of approximately 2 grams of cocaine from MARTINEZ in the Eastern District of Tennessee.

10. On or about July 9, 2020, a confidential source called Juan LOPEZ ("LOPEZ") to purchase cocaine. Toll records confirmed that the confidential source called LOPEZ as stated. Prior to the deal, LOPEZ was recorded speaking with the confidential source on the telephone and telling the confidential source where to go to complete the deal. When the confidential source arrived at the prearranged location for the deal, MARTINEZ and Serguin Castro-

Carias ("JOSE") arrived and delivered approximately 8 grams of cocaine to the confidential source. After the deal, MARTINEZ was surveilled by law enforcement driving to meet LOPEZ. When MARTINEZ arrived at LOPEZ's location, law enforcement observed MARTINEZ hand something to LOPEZ. LOPEZ was then followed by law enforcement back to a mobile home located at 3023 Bryan Road, Lot 26, Kodak, Tennessee ("LOPEZ RESIDENCE.")

11. On or about July 22, 2020, law enforcement conducted a controlled purchase of approximately 2 grams of cocaine from MARTINEZ in the Eastern District of Tennessee. MARTINEZ was driving a vehicle that was registered to LOPEZ.

12. On or about August 18, 2020, Nolvia Carillo ("NOLVIA") was pulled over by local law enforcement in the Eastern District of Tennessee. In her vehicle, law enforcement found approximately 3 grams of cocaine along with more than $1,900 in cash. NOLVIA agreed to speak with law enforcement. NOLVIA admitted that she was working with others to purchase kilogram quantities of cocaine from a source of supply in Texas. NOLVIA stated that she paid approximately $38,000 per kilogram of cocaine. A search of NOLVIA's phone revealed a picture of what appeared to be a kilogram of cocaine, and messages that confirmed that NOLVIA had negotiated the purchase of kilogram quantities of cocaine. The geo-location information attached to the photograph of cocaine demonstrated that the photograph was taken inside the LOPEZ RESIDENCE.

13. On or about September 25, 2020, law enforcement conducted a controlled purchase of approximately 3.5 grams of cocaine from MATEO in the Eastern District of Tennessee.

14. On or about September 30, 2020, law enforcement conducted a controlled purchase of approximately 1 gram of cocaine from MATEO in the Eastern District of Tennessee.

7

15. On or about December 7, 2020, law enforcement conducted a controlled purchase of approximately 3.5 grams of cocaine from MARTINEZ in the Eastern District of Tennessee.

16. On or about December 16, 2020, law enforcement conducted a controlled purchase of approximately 4.2 grams of cocaine from JOSE in the Eastern District of Tennessee.

17. On or about December 17, 2020, law enforcement conducted a controlled purchase of approximately 1 ounce of cocaine from JOSE in the Eastern District of Tennessee.

18. Pursuant to a federally authorized wiretap on a cellular phone used by LOPEZ, on or about December 12, 2020, law enforcement intercepted LOPEZ instructing MARTINEZ to deliver cocaine to an unknown male. Law enforcement surveilled MARTINEZ and watched him meet with James Hickman ("HICKMAN"). Following this meeting, law enforcement conducted a traffic stop on HICKMAN. Inside HICKMAN's vehicle, law enforcement found approximately 4 grams of cocaine, along with other types of drugs. HICKMAN agreed to speak with law enforcement and admitted that he had frequently purchased cocaine from LOPEZ.

19. On or about January 9, 2021, MARTINEZ was interviewed by law enforcement. MARTINEZ admitted that he worked for LOPEZ, and that LOPEZ provided MARTINEZ with approximately 30 ounces of cocaine each week to sell on LOPEZ's behalf. Law enforcement searched MARTINEZ's phone, which contained text message conversations with a phone number used by MATEO. Those conversations included a discussion about the sale of cocaine. MARTINEZ told law enforcement that MATEO also worked with LOPEZ to distribute cocaine.

20. On or about January 15th, 2021, law enforcement conducted a controlled purchase of approximately 2 grams of cocaine from JOSE in the Eastern District of Tennessee.

21. On or about April 5, 2021, law enforcement conducted a controlled purchase of approximately 1 ounce of cocaine that was ordered from LOPEZ but delivered by JOSE in the Eastern District of Tennessee.

22. On or about April 14, 2021, law enforcement conducted a controlled purchase of approximately 1 ounce of cocaine from LOPEZ in the Eastern District of Tennessee. NOLVIA was present in the vehicle with LOPEZ when LOPEZ delivered the cocaine.

23. On or about April 21, 2021, law enforcement conducted a controlled purchase of approximately 4 grams of cocaine from MATEO in the Eastern District of Tennessee.

24. On or about May 15, 2021, law enforcement conducted a controlled purchase of approximately 1 ounce of cocaine from NOLVIA. The confidential source negotiated the purchase of the cocaine in phone calls with LOPEZ, who directed the confidential source to enter a trailer and meet with "his girl." NOLVIA was inside the trailer and handed the cocaine to the confidential source.

### *Target Residence*

25. On or about September 29, 2021 a federal complaint and arrest warrant for MATEO was signed by a United States Magistrate Judge alleging violations of Title 21, United States Code, Sections 846 and 841. On or about September 30, 2021, law enforcement observed MATEO arrive at the TARGET RESIDENCE and go inside. Law enforcement then entered the TARGET RESIDENCE to arrest MATEO. While law enforcement was inside the TARGET RESIDENCE effectuating the arrest of MATEO, and conducting a protecting sweep, law enforcement observed the following in plain view: A bag containing a white powdery substance that, in the training and experience of law enforcement, appeared to be cocaine; Two digital scales, including one digital scale in the same room as the suspected cocaine; a large amount of loose cash viewable in an open drawer.

26. Based on my training and experience, the presence of suspected cocaine, digital scales, and loose cash are all hallmarks of drug trafficking. Coupled with the fact that a known drug trafficker such as MATEO was arrested inside the TARGET RESIDENCE at the same time

9

that those items were seen by law enforcement leads me to believe that there is probable cause to search the TARGET RESIDENCE. When MATEO was arrested, there was a cellphone that appeared to belong to him running videos open inside the trailer.

## **CONCLUSION**

27. Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

_____
JOHN SHARP
TFO FBI

Subscribed and sworn to ~~before~~ me on September 30th, 2021.

_____
DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property to Be Searched

This warrant applies to the property and its curtilages and outbuildings, appurtenances, attached and detached garages and or sheds, located 1039 Country Colonial Street, Lot 50, Sevierville, TN, hereinafter the "TARGET RESIDENCE," This property is described as follows:

<u>Description</u>: It is a single family, single story trailer with green bordering around white paneling, with the numbers 1039 and 50 on the side of the home. See the photos below.



1



# ATTACHMENT B

## Particular Things to be Seized

Packaging material, scales, and items used to weigh, package, measure, and distribute narcotics; drug paraphernalia; drug records, drug ledgers, account books, notes, names or code names and nicknames, or identifying information reflecting customers, amounts of drugs bought and sold, and amounts of money paid, owed or collected; United States Currency reflecting proceeds of drug sales or monies set aside for the purchase of drugs; financial instruments; safes, lock boxes, lockable money bags, and other containers which can be used to secure and conceal drugs, currency, firearms, proceeds of drug transactions, or records of drug transactions; telephone and address books, notes, cellular telephones, personal computers with hard discs of portable memory devices containing telephone and addresses of co-conspirators or other such records, photographs, or videotapes indicating a criminal association between co-conspirators; records reflecting the identities, addresses, and telephone numbers of customers who use, transport, or distribute narcotics; safety deposit box keys; financial records relating to sales of narcotics or the laundering of proceeds from the sale of narcotics, and other containers used to store or secrete currency or records described herein; Firearms, ammunition or other weapons used to protect drugs or proceeds of illegal drug sales, or purchased with proceeds from illegal drug sales; Records pertaining to bank accounts, savings accounts, brokerage accounts, any and all stored value cards, and all financial records relating to the concealing of proceeds of the receipt, investment or disbursement of proceeds, including records of domestic and foreign money transactions or records of the transfer of funds within or into and out of the United States; Papers, passports visas or other travel documents, identification cards of papers, driver's licenses, tickets, notes, receipts, and other items relating to travel expenditures; computers, electronic storage

1

devices, physical keys, encryption devices, dongles, and similar physical items necessary to gain access to computer equipment, electronic storage devices, or data; and any and all items used in the furtherance of distribution of and possession with the intent to distribute cocaine, in violation of 21 U.S.C. § 841; and conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841 and 846.